## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN KOLENKO and JACKIE BARHAM, individually and on behalf of all others similarly situated, | Case No.    1:17-CV-183 |
| Plaintiffs, | **CLASS ACTION** |
| v. | **DEMAND FOR JURY TRIAL** |
| SERVIS ONE, INC. d/b/a BSI FINANCIAL SERVICES, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

COMES NOW, Jackie Barham and John Kolenko ("Plaintiffs") on behalf of themselves and all others similarly situated and allege as follows:

## INTRODUCTION

1.      Defendant Servis One, Inc. d/b/a BSI Financial Services, Inc. ("Defendant") is a mortgage servicer that has voluntarily undertaken an important duty to service mortgage loans.

2.      By undertaking this duty, Defendant has obligated itself to accurately communicate and fairly interact with homeowners.

3.      Defendant has fallen far short of meeting this obligation, and has instituted policies and practices that actively undermine Defendant's duty to homeowners.

4.      Defendant's policies and practices have resulted in systemic violations of mortgage servicing laws and have substantially harmed homeowners, including Plaintiffs and the class members.

1

5.     Plaintiff and the class members cannot switch mortgage servicers to avoid Defendant's harmful policies and practices, they instead are stuck with Defendant and are forced to suffer at Defendant's whim.

6.     Plaintiffs and the class members have suffered and will continue to suffer great harm should Defendant be allowed to continue the policies and practices described below.

7.     Accordingly, Plaintiffs and the class members bring this action to obtain redress for the harm Defendant already has caused, to disgorge the unjust profits Defendant has obtained, and to enjoin Defendant from continuing to harm homeowners.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs are brining claims under 12 U.S.C. § 2605.

9.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different than Defendant.

10.     Plaintiff's claims asserted herein arose in this judicial district and Defendant does substantial business in this judicial district.  On information and belief, both of Plaintiff's loans were serviced out of Defendant's Titusville, Pennsylvania office.

11.     Venue in this judicial district is proper under 28 U.S.C. § 1391 in that this is the judicial district in which a substantial part of the events and/or omissions at issue occurred.  On information and belief, both of Plaintiff's loans were serviced out of Defendant's Titusville, Pennsylvania office.

## PARTIES

12.     Plaintiff Jackie Barham is a resident and citizen of the State of California, and her mortgage loan is currently serviced by Defendant.

13.     Plaintiff John Kolenko is a resident and citizen of the Commonwealth of Pennsylvania, and his mortgage loan was serviced by Defendant.

14.     Defendant Servis One, Inc. d/b/a BSI Financial Services, Inc. is a Delaware corporation with its principal place of business located in Irving, Texas.

15.     Defendant's servicing department is located in Titusville, Crawford County, Pennsylvania, and Defendant directs customers to send qualified written requests and other servicing correspondence to its Titusville servicing office, and both Plaintiffs had interactions with Defendant's Titusville office at all times relevant hereto.

## FACTUAL ALLEGATIONS

### I.      Defendant and the Mortgage Servicing Industry

16.     Defendant is an independent mortgage loan servicer and sub-servicer.

17.     In this capacity, Defendant purchases the right to service mortgages, and provides servicing options for entities that own the right to service mortgages.

18.     As a mortgage servicer, Defendant is responsible for the day-to-day operation of the loans it services, including, among other things, collecting, processing and applying monthly mortgage payments, paying property taxes and other amounts out of escrow, remitting principal and interest payments to the persons and entities who actually own the mortgage loans, communicating accurate payment information, maintaining accurate loan balances, and helping borrowers mitigate loss when they are having trouble making mortgage payments or are in danger of falling behind on mortgage payments.

3

19.    Defendant's obligation to properly collect and apply mortgage payments, to work with homeowners to reach workable and affordable modification solutions, and to overall properly service mortgage loans is important because homeowners cannot switch servicers in the event that Defendant is negligent or reckless in servicing a loan or in the event Defendant intentionally services a loan improperly.

20.    When a homeowner takes out a mortgage loan, that loan is sold, bundled, and then sold again to investors who then sell the rights to collect payments and manage the loans to third-party servicers, like Defendant.

21.    Homeowners do not and cannot choose their mortgage servicer.  They are stuck with the servicer who bids on, and ultimately purchases the right to service their loan—they do not have the option of switching to another servicer if their servicer treats them unfairly or violates the law.

**II.    Defendant's Mortgage Servicing Policies and Practices**

22.    Despite the significant obligations Defendant has undertaken in purchasing mortgage servicing rights, it has rejected its duty to treat homeowners fairly and lawfully and with basic respect and dignity.

23.    Instead, Defendant has employed policies, practices and procedures that have led to and even encouraged systemic violations of federal mortgage servicing laws.  These policies, practices and procedures treat homeowners and their mortgages as commodities through which Defendant can extract profit.

24.    For instance, Defendant requires its employees to call a certain number of borrowers with delinquent or distressed loans per shift, and penalizes its employees in the event they do not meet this quota.

25.    Defendant also requires its employees to follow a script when speaking with mortgage holders and instructs its employees to give three options to the holders of distressed or delinquent mortgage loans: 1) bring the loan current; 2) apply for a modification through Defendant; or 3) list their home for sale with Defendant.  Defendant further instructs its employees to advise mortgage holders that they could be evicted and the foreclosure process would be started against them should they fail to qualify or meet one of Defendant's three options.

26.    In the event a borrower chooses Defendant's first option and is able to bring his or her loan current, Defendant's employees receive no additional compensation.

27.    In the event a borrower chooses Defendant's second option and modifies an existing mortgage and agrees to make payments on the new mortgage through Defendant, Defendant's employees receive a one-time commission fee for a certain dollar amount.

28.    In the event a borrower chooses Defendant's third option and agrees to list his or her home for sale with Defendant, Defendant's employees receive a commission based on the value of the existing loan and/or the market price of the property.  The third option is Defendant's preferred option for homeowners and the best way to extract the most profit.

29.    Defendant's quota system, its scripts, and its compensation structure clearly disincentivize Defendant's employees to work with homeowners to stay in their homes or to fix inaccuracies associated with homeowner accounts.

30.    For example, determining whether a loan should be modified, or whether an inaccuracy exists within a loan account requires lengthy and detailed conversations with a borrower and detailed analysis of the borrower's account and his or her particular financial situation.

31.    Defendant's quota system, however, prioritizes contacting as many borrowers as possible instead of taking the time necessary to determine what is right for a specific borrower.

32.    Furthermore, Defendant's scripts prevent its employees from trying to work on flexible solutions for borrowers or fixing any inaccuracies with borrower accounts.

33.    Finally, Defendant's compensation structure perversely and above all else incentives its employees to prioritize getting homeowners out of their homes.  Defendant's employees receive no additional compensation should a homeowner come current on their loans, which clearly does not incentivize Defendant's employees to help homeowners make their payments or figure out inaccuracies associated with borrower accounts.  Instead, Defendant provides bonuses should an employee convince a homeowner to modify their loan through Defendant or sell their home through Defendant.  By tying bonuses to outcomes that always benefit Defendant at the expense of homeowners, Defendant has created a system in which borrowers are far more likely to be unable to stay in their homes.

34.    These problems are compounded by the Defendant's and the servicing industry's obsession with automation and worker productivity.

35.    In an effort to reduce costs, Defendant understaffs its departments and fails to provide adequate training to the persons it does employ.

36.    Defendant's chronically understaffed and undertrained departments are unable to properly service mortgage loans, and do not have the time or knowledge necessary to properly advise homeowners or fix inaccuracies associated with their accounts.

37.    Defendant also largely relies on automated proprietary software and computer systems to manage and service mortgage loans.  Reliance on such systems is problematic because system-wide deficiencies can result in critical errors in servicing loans.

38.    Defendant's reliance on automated systems, its failure to hire and properly train its employees, and the quota systems and compensations structures it imposes have repeatedly and frequently resulted in the following outcomes:

a.    Defendant's servicing departments are unreachable and are nonresponsive, and even when borrowers speak with Defendant's employees, those employees are unable or unwilling to answer borrower inquires and are hostile and rude;

b.    Defendant's servicing departments randomly and frequently reassign single points of contact to borrowers;

c.    Defendant's servicing departments lose paperwork and payments, and/or fail to compile paperwork and payment history into borrower accounts, and require borrowers to resubmit papers, payments and documents that already were sent to and received by Defendant;

d.    Defendant's servicing departments fail to respond to or investigate borrower inquiries, and even when they do, inaccuracies and discrepancies are not identified or are not corrected;

e.    Defendant's servicing departments submit inaccurate, incomplete, unlawful and/or out-of-date information to courts, regulatory agencies, credit reporting agencies, banks, and other third parties;

f.    Defendant's servicing departments fail to provide borrowers with all available loss mitigation options, fail to evaluate loss mitigation requests, and provide false or inaccurate reasons for borrower disqualification; and

g.    Defendant's servicing departments, in connection with mortgage servicing and subservicing transfers, routinely fail to ensure that accurate and up-to-date documents and information, including, but not limited to, copies of "in process" loss mitigation agreements,

7

documentation and information, is transferred, and in the departments' possession, before, during or after transfer of mortgage servicing or sub-servicing rights.

39.     Defendant's policies and practices have harmed Plaintiffs and the class members and will continue to harm them in the future.

40.     Since 2012, more than 900 complaints have been filed with the Consumer Financial Protection Bureau regarding Defendant's conduct, its illegal practices and its unwillingness to work with borrowers.

**III.     Plaintiff Barham's Experience**

41.     Plaintiff Barham has experienced significant harm as a result of Defendant's policies and practices.

42.     In 2014, Ms. Barham's loan was serviced by Ocwen.  Towards the end of 2014, Ms. Barham fell behind on her loan payments, but explained to Ocwen that she could come current within three months.  Ocwen rejected Ms. Barham's request to come current, requesting that she either pay the full past balance immediately or enter into a forbearance agreement on terms favorable to Ocwen.

43.     Ms. Barham had until November 5, 2014 to accept the forbearance agreement, but that agreement was delivered to her the same day she had to accept it.  This directly violates 12 C.F.R. § 1024.41(e), which requires servicers to allow a borrower to accept or reject an offer of a lose mitigation option no earlier than 14 days after the servicer provides the offer of the loss mitigation option to the borrower.

44.     As a result of Ocwen's actions, Ms. Barham was not able to properly evaluate Ocwen's loss mitigation option.  Furthermore, despite being able and willing to pay off her loan

amount, Ocwen refused to work with Ms. Barham resulting in the further accrual of missed payments and late fees.

45.     Ocwen transferred its servicing rights to Rushmore in the middle of 2015.  Ms. Barham attempted to contact Rushmore, but was never able to get in touch with their offices. During this time, missed payments and late fees continued to accrue despite her willingness and ability to make payments on her loan.

46.     In October of 2015, the servicing rights to Ms. Barham's loan were sold to BSI. Ms. Barham alerted BSI to her situation and made clear that she was able to make payments and pay off her loan amount if given the chance.  Despite this information, BSI refused to work with Ms. Barham.

47.     Ms. Barham sent multiple requests for information to Defendant, and Defendant provided no answer to these requests unless the Consumer Financial Protection Bureau contacted BSI and forced a response.  Defendant's multiple failures to respond to or investigate Ms. Barham's information requests are in direct violation of 12 C.F.R. § 1024.36(c) and (d), which require servicers to acknowledge receipt of an information request, and investigate and respond to information requests.  Defendant's conduct also violated 12 U.S.C. § 2605(k)(1)(C), which requires servicers to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, avoiding foreclosure, or other standard servicer duties.  Finally, Defendant's conduct violates 12 U.S.C. § 2605(e), which requires servicers to respond to qualified written requests.

48.     In early 2016, Ms. Barham attempted to obtain a modification from BSI, but was turned down on the representation that she had previously been denied or failed to perform a modification request, and that her missed payments and late fees presented excess obligations.

9

49.     These reasons were false because Ms. Barham was never lawfully denied a modification as Ocwen's prior forbearance offer was illegal and Ms. Barham did not have sufficient time to consider it.  Additionally, Ms. Barham's past due balance amount, which accrued not as a result of Ms. Barham's inability or unwillingness to make payments, but because of her servicers', including Defendant's, refusal to take payments until lump sums were paid off, was not excessive since she could have paid off that amount.  In fact, Ms. Barham ultimately paid off that amount in the middle of 2016, demonstrating that the obligation was not excessive given her particular circumstances.

50.     Defendant's failure to properly and truthfully evaluate Ms. Barham's request for a modification is in direct violation of 12 C.F.R. § 1024.41(c), which, among other things, requires servicers to review and evaluate loss mitigation requests.  It is clear that Defendant did not evaluate Ms. Barham's modification application because, if Defendant had evaluated Ms. Barham's application, it would not have denied her application on the grounds it did.

51.     Ms. Barham sought to appeal her denial, and contacted Defendant to do so, but Defendant failed to respond.  This violates 12 C.F.R. § 1024.41(h), which grants borrowers the right to appeal a servicer's determination to deny a borrower's loss mitigation application. Defendant's failure to respond to Ms. Barham's appeal request also violates 12 C.F.R. § 1024.36(c) and (d), and 12 U.S.C. § 2605(k)(1)(C).

52.     Defendant continued to refuse to work with Ms. Barham to modify her loan, despite the fact that she was willing and able to make payments, and also willing and able to pay her past due balances.  Defendant's refusal to accept any payments until the total past due balance was paid, as well as Defendant's refusal to contact or work with Ms. Barham, resulted in her accruing unwarranted and unnecessary late fees and other charges.

10

53.    In the middle of 2016, Ms. Barham finally collected the funds to make a lump sum payment on her past due balances to make her loan current.  Defendant misapplied these funds once they were paid.

54.    Defendant also filed a notice of default on Ms. Barham in the middle of 2016.  This was improperly filed as Ms. Barham had appealed her modification denial.  While Defendant ultimately rescinded the notice of default, they never sent Ms. Barham the recession, which she asked for multiple times.

55.    Defendant's treatment of Ms. Barham evidences a pattern of violating RESPA, and demonstrates that Defendant did not wish to help Ms. Barham become current.  This is no surprise seeing as Defendant's employees are not incentivized to help homeowners come current, but rather are incentivized to force them into modifications that are favorable to Defendant or foreclosure sales.  As a result of Defendant's practices, Ms. Barham has suffered great monetary harm, frustration and emotional injury.

**IV.    Plaintiff Kolenko's Experience**

56.    Plaintiff Kolenko has experienced significant harm as a result of Defendant's policies and practices.

57.    Mr. Kolenko's mortgage loan was serviced by CitiBank before it was transferred to BSI.  While Mr. Kolenko's loan was with Citi, he obtained a loan modification.

58.    When his loan was transferred to BSI, Mr. Kolenko sought another modification, and BSI instructed Mr. Kolenko to complete and return the required paperwork.

59.    Despite mailing Defendant all required paperwork numerous times, Mr. Kolenko was repeatedly told that paperwork was missing and was repeatedly given multiple points of contact.  This is in violation of 12 C.F.R. § 1024.41(b) and (c), which require servicers to use

reasonable diligence in obtaining loss mitigation paperwork and require servicers to review complete loss mitigation applications.  Defendant's failure to use reasonable diligence in receiving Mr. Kolenko's complete loss mitigation application and its false statements that Mr. Kolenko provided incomplete paper work violate Section 1024.41(b).  Furthermore, Defendant's failure to evaluate the complete loss mitigation application Mr. Kolenko produced violated Section 1024.41(c).

60.    At one point, Defendant attempted to foreclose on Mr. Kolenko's home while he was attempting to obtain his loan modification.  This is in violation of 12 C.F.R. § 1024.41(f)(2), which prohibits servicers from initiating foreclosure proceedings when a borrower submits a complete loss mitigation application.

61.    Mr. Kolenko finally obtained a modification, and Defendant represented to Mr. Kolenko that his new payments included escrow amounts and that Defendant would pay Mr. Kolenko's taxes and insurance out of escrow.

62.    Defendant, however, never paid the insurance out of Mr. Kolenko's escrow and Mr. Kolenko's insurance lapsed.  This is in violation of 12 C.F.R. § 1024.34(a) and 12 U.S.C. § 2605(g), which requires servicers to make payments from a borrower's escrow account in a timely manner.  Afterwards, BSI placed hazard insurance on Mr. Kolenko's home.  This is in violation of 12 U.S.C. § 2605(k)(1)(A) which prohibits obtaining force-placed hazard insurance unless there is a reasonable basis to believe a borrower has failed to comply with a loan contract's requirements to maintain property insurance.  It was Defendant's, not Mr. Kolenko's, fault that Mr. Kolenko's property insurance lapsed.  As such, Defendant was not permitted to obtain force-placed hazard insurance on Mr. Kolenko's property.

63.    This resulted in Mr. Kolenko accruing unnecessary charges and fees.

64.    Furthermore, Defendant never sent a monthly statement, or any payment paperwork to Mr. Kolenko during the time Defendant serviced Mr. Kolenko's mortgage loan.

65.    Defendant also inaccurately claimed Mr. Kolenko's mortgage loan was in bankruptcy.

66.    Defendant stopped servicing Mr. Kolenko's loan in 2017.  Fay Servicing LLC is now Mr. Kolenko's servicer.

67.    Defendant's treatment of Mr. Kolenko evidences a pattern of violating RESPA, and demonstrates that Defendant did not wish to help Mr. Kolenko become current.  This is no surprise seeing as Defendant's employees are not incentivized to help homeowners come current, but rather are incentivized to force them into modifications that are favorable to Defendant or foreclosure sales.  As a result of Defendant's practices, Mr. Kolenko has suffered great monetary harm, frustration and emotional injury.

## CLASS ALLEGATIONS

68.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and seek to certify the following classes:

**The Nationwide Class:**

All persons in the United States whose mortgage loans were in arrears at any time when Defendant serviced those loans.

**The California Class:**

All persons in the California whose mortgage loans were in arrears at any time when Defendant serviced those loans.

**The Pennsylvania Class:**

All persons in Pennsylvania whose mortgage loans were in arrears at any time when Defendant serviced those loans.

**The Multi-State Class:**

All persons residing in states with similar laws and whose mortgage loans were in arrears at any time when Defendant serviced those loans.

**The Injunctive Relief Class:**

All persons in the United States whose mortgage loans were, or will be, serviced by Defendant.

69.    Excluded from the classes are Defendant and its officers, directors and employees, the Court, the Court's immediate family and all Court staff, and Plaintiff's attorneys and their immediate family members.

70.    <u>Numerosity:</u> The classes described above are so numerous that joinder of all individual members in one action would be impracticable.  On information of belief, hundreds, if not thousands of citizens have had their loans serviced by Defendant.  The disposition of the individual claims of the respective class members through this class action will benefit both the parties and this Court, and will facilitate judicial economy.

71.    <u>Ascertainability:</u> The classes are ascertainable because Defendant keeps and collects the information of each class member in a detailed electronic database, and records when it takes over the servicing rights for each class member.

72.    <u>Typicality:</u>  Plaintiffs' claims are typical of the claims of the members of the classes.  The claims of the Plaintiffs and members of the classes are based on the same legal theories and arise from the same unlawful conduct.  The claims of Plaintiffs and the classes arise from the same servicing practices, which have led to the unfair and unlawful treatment of Plaintiffs and all members of the classes.  As such, the claims of Plaintiffs and the classes rise and fall together and are typical of one another.

73.     <u>Common Questions of Fact and Law Predominate:</u>  There are numerous questions of law or fact common to all class members.  For example, whether Defendant's mortgage servicing practices result in systemic violations of mortgage servicing laws, and are otherwise unfair is common to each class member.  Each class member will use the same evidence to prove whether Defendant's practices are unfair and result in systemic violations of federal law. Similarly, whether an injunction should issue against Defendant for its practices described herein is a question common to each member of the classes, and a question capable of class-wide resolution.  These and other common questions predominate over individual issues.

74.     <u>Adequacy of Representation:</u>  Plaintiffs are adequate representatives of the classes because their interests do not conflict with the interests of the members of the classes.  Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the classes and has no interests antagonistic to the members of the classes.  Plaintiffs have retained counsel who are competent and experienced in the prosecution of complex consumer class action litigation.

75.     <u>Superiority:</u> The injury sustained by each class member, while meaningful on an individual basis, is not of such magnitude that it is economically feasible to prosecute individual actions against Defendant.  Even if it were economically feasible, requiring myriad injured plaintiffs to file individual suits would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments.  By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

76.     Class certification also is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the classes, making

appropriate both declaratory and injunctive relief with respect to Plaintiffs and the classes as a whole.

### COUNT I
**Violation of the Real Estate Settlement and Procedures Act ("RESPA")**
**12 U.S.C. § 2601, *et seq.***

77.     The allegations contained in the previous paragraphs are incorporated by reference.

78.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

79.     Defendant is a "servicer" and is engaged in "servicing" as those terms are defined in RESPA.  12 U.S.C. § 2605(i)(2) and (3).

80.     Defendant has engaged in a pattern or practice of violating RESPA and its implementing regulations.

81.     As more fully detailed above, Defendant, with respect to Plaintiffs, has repeatedly violated 12 U.S.C. §§ 2605(c), (e), (k)(1)(A), (k)(1)(C), and (g), and 12 C.F.R. §§ 1024.33(b), 1024.34(a), 1024.36(c) and (d), and 1024.41(b), (c), (f)(2) and (h).

82.     These violations and other RESPA violations occurred and continue to occur frequently to other members of the class.

83.     To cite one example, over 900 complaints have been filed with the Consumer Financial Protection Bureau against Defendant since 2012.  Many of these complaints detail violations of RESPA and its implementing regulations.

84.     As a result of Defendant's pattern or practice of violating RESPA, Plaintiffs and the class are entitled to actual damages, statutory damages, costs and attorneys' fees.

<u>**COUNT II**</u>
**Violation of California's Unfair Competition Law ("UCL")**
**Cal Bus. & Prof. Code §§ 17200, *et seq.***

85.     The allegations contained in the previous paragraphs are incorporated by reference.

86.     Plaintiff Barham brings this claim individually based on the laws of California and on behalf of the California Class, the Multi-State Class and the Injunctive Relief Class.

87.     The UCL protects consumers by promoting fair competition in commercial markets for goods and services.

88.     The UCL prohibits any unlawful, unfair or fraudulent business acts or practices.

89.     Defendant's practice of incentivizing its employees to force borrowers out of their homes or to force borrowers to agree to modifications on terms beneficial to Defendant and its decision to run understaffed and untrained servicing departments are unlawful because they directly result in systemic violations of federal mortgage servicing laws.

90.     These practices also are unfair because Defendant, as a mortgage servicer, has a duty to homeowners to service their loans properly and work with them so that those loans can adequately perform, but instead, the practices at issue were created to violate that duty and ensure that loans do not perform and homeowners are required to sell their homes or modify their loans on terms favorable to Defendant.

91.     These practices also are fraudulent because Defendant's compensation structure and its failure to employ proper procedures and systems frequently and repeatedly result in false statements regarding, among other things modification denials, lost paperwork and a failure to receive payments.

92.     Plaintiff and the class members could not avoid Defendant's unlawful, unfair and fraudulent acts and practices because borrowers cannot choose their mortgage servicer.

93.    After a mortgage loan is originated, it is sold, packaged, and then sold again to investors.  Servicing rights are then sold to various companies, who can then sell those rights, or farm them out to third parties.  The complex web of relationships that develop after a mortgage loan is originated prevent borrowers from avoiding the practices of mortgage loan servicers. Borrowers, like Plaintiff and the classes, are at the mercy of whoever buys the rights to service their mortgage loan.

94.    Defendant's unlawful, unfair and fraudulent acts and practices present no countervailing benefits that outweigh the substantial harm caused to homeowners.

95.    Defendant's acts and practices hurt borrowers by, among other things, routinely failing to contact and communicate with borrowers, falsely denying loan modifications, requiring borrowers to send paperwork that already is in Defendant's possession and failing to credit payments.

96.    While Defendant may benefit financially from these practices, *i.e.*, by saving costs through understaffing and foregoing proper training and by obtaining loan modifications and sales that financially benefit Defendant, that financial benefit does not outweigh the personal and societal harm caused by Defendant's practices.

97.    Plaintiff and the members of the classes have been injured in fact and suffered a loss of money or property as a result of Defendant's unlawful, unfair and fraudulent business acts and practices.

98.    Plaintiff and the members of the classes seek an order from this Court enjoining Defendant's unlawful, unfair and fraudulent acts and practices and requiring Defendant to restore Plaintiff's and the members of the classes and pay restitution in an amount to be determined at trial.

## COUNT III
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Act ("UTPCPL"), 73 Pa. Stat. § 201-1, *et seq.*

99.     The allegations contained in the previous paragraphs are incorporated by reference.

100.    Plaintiff Kolenko brings this claim individual based on the laws of Pennsylvania and on behalf of the Pennsylvania Class, the Multi-State Class and the Injunctive Relief Class.

101.    Plaintiff and Defendant are "persons" within the meaning of the UTPCPL.  73 Pa. Stat. § 201-2(2).

102.    The UTPCPL declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 Pa. Stat. § 201-3.

103.    "Unfair methods of competition" and "unfair or deceptive acts or practices" are defined as, among other things, "[e]ngaging in any fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Stat. § 201-2(4)(xxi).

104.    "Trade" and "commerce" mean "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."  73 Pa. Stat. § 201-2(3).

105.    Defendant's distribution and provision of mortgage services qualifies as trade or conduct within the meaning of the UTPCPL.

106.    Defendant's mortgage servicing practices as detailed above qualify as unfair methods of competition and unfair or deceptive acts or practices within the meaning of the UTPCPL.

107.     Plaintiff is entitled to recover under the UTPCPL because he purchased goods and services primarily for personal, family or household purposes and suffered an ascertainable loss of money or property as a result of Defendant's unlawful practices.  73 Pa. Stat. § 201-9.2

108.     Plaintiff purchased his home by taking out a mortgage to finance that purchase. After Plaintiff's purchase was completed, and after his loan was originated, Defendant started providing mortgage services to Plaintiff in an effort to collect the remaining unpaid balance on the loan Plaintiff used to purchase his home.  As a result of Defendant's unlawful servicing practices, Plaintiff has lost money and property.

109.     Accordingly, Plaintiff and the members of the classes seek actual, treble and statutory damages, costs and reasonable attorney fees, and such additional relief as the court deems necessary or proper.

### COUNT IV
### Negligence

110.     The allegations contained in the previous paragraphs are incorporated by reference.

111.     Plaintiffs bring this claim individually based on the laws of California and Pennsylvania, and on behalf of the California Class, Pennsylvania Class and the Multi-State Class.

112.     Defendant had a duty to Plaintiffs and the classes because the transactions between Defendant and the classes were intended to affect each class member, if Defendant improperly serviced the loans of Plaintiffs and the classes harm was foreseeable and certain, Defendant's conduct is the direct cause of the harm Plaintiffs and the classes suffered, a high degree of moral blame attaches to Defendant's conduct, and policy supports imposition of a duty in this scenario.

113.     Each transaction between Defendant and the members of the classes is intended to affect Plaintiffs and the classes as the transactions involve their mortgage loans and the homes that serve as security.

114.    Harm is foreseeable to Plaintiffs and the classes from the mismanagement of Defendant's servicing duties because it is foreseeable that Defendant's failure to contact borrowers and consider their modification requests will negatively affect their chances of obtaining a modification, from accruing late fees and other foreclosure and delinquent related charges, and from ultimately staying in their homes.  Defendant's failure to properly receive payments and other documents similarly causes foreseeable harm as it is foreseeable that Defendant's mismanagement will lead to the imposition of late fees and general frustration and emotional harm to Plaintiffs and the classes.

115.    All of this harm also is certain to result.  If Defendant does not contact borrowers it is certain that their loan modifications will be denied and that they will be unable to come current on their accounts.  Likewise, if Defendant does not timely accept payments, it is certain that late fees will occur.

116.    Defendant's compensation structure, and its failure to staff its servicing departments so they can properly service mortgage loans, is closely related and directly causes the harm suffered by Plaintiffs and the classes.  Had Defendant properly incentivized its employees, Defendant's employees would actually work with homeowners to keep their homes.  And had Defendant properly staffed its servicing departments, Defendant's employees would be able to contact borrowers and work with them so borrowers can come current on their accounts.

117.    Defendant's purchasing of mortgage servicing rights when Defendant did not intend to have the infrastructure and proper policies or procedures in place to fulfill its duties as a mortgage servicer is morally blameworthy because Defendant knew what was needed to properly service mortgage loans, but decided not to meet those obligations.  This has caused harm to

borrowers, and importantly, the borrowers cannot escape this harm as they cannot choose whether Defendant services their mortgage loan.

118.    Finally, public policy supports imposition of a duty here because without a duty of care applicable to Defendant, Defendant can treat borrowers without regard for the consequences of its actions.  Since Defendant's mismanagement of Plaintiffs and the members of the classes mortgages can literally result in them becoming homeless, and since Plaintiffs and the classes have no mechanism to avoid Defendant from servicing their loans, public policy not only supports, but requires that some standard of care apply to Defendant to protect Plaintiffs and the classes.

119.    For all of the reasons, a duty of reasonable care exists as between Defendant and the classes.

120.    Defendant violated that duty by incentivizing its employees to push borrowers into foreclosure or modify their loans on terms favorable to Defendant.  Defendant further violated that duty by creating mortgage servicing departments that are not adequately staffed or trained to service mortgage loans, and that rely largely on automation to service mortgage loans even when servicing particular loans, like distressed loans, requires individual effort and time in order to effectuate proper management.

121.    Defendant's conduct proximately caused the harm Plaintiffs and the classes suffered.

122.    For instance, Jackie Barham had the ability to come current on her loan, but because Defendant refused to work with her, never contacted her, and ultimately attempted to force her out of her home, Ms. Barham experienced myriad unnecessary fees and illegal conduct, as well as frustration and emotional harm.

123.    Defendant's conduct has caused injury to Plaintiffs and the classes in an amount to be proven at trial.  These injuries include, but are not limited to, a cloud on the title of their homes, foreclosure on their homes, illegal and unnecessary fees assessed against their mortgage loans, and emotional harm and injury.

**COUNT V**
**Unjust Enrichment**

124.    The allegations contained in the previous paragraphs are incorporated by reference.

125.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

126.    Plaintiffs and the members of the class conferred Defendant with direct benefits by making payments of illegal fees to Defendant.

127.    Plaintiff and the members of the class also conferred Defendant with direct benefits by allowing Defendant to obtain servicing income from the owners of the mortgages of Plaintiffs and the members of the class.

128.    Defendant is aware of the receipt of these direct benefits and is in possession of the same.

129.    It is unjust to allow Defendant to retain these benefits because the fees Defendant collected from Plaintiff and the members of the class are unlawful, and the income Defendant received from servicing the loans was unjustified because Defendant failed to provide adequate servicing functions.

130.    Plaintiff and the members of the class seek restitution from Defendant, and seek an order disgorging Defendant from all wrongfully obtained profits and benefits and any other unjustified compensation.

## COUNT VI
### Injunction

131.    The allegations contained in the previous paragraphs are incorporated by reference.

132.    Plaintiffs bring this claim individually and on behalf of the Injunctive Relief Class.

133.    An injunction is appropriate here because without it, Plaintiffs and the class face irreparable injury.  Defendant is operating its business in a way that is directed and constructed to create harm for Plaintiffs and the class in order to benefit Defendant.  Furthermore, Plaintiffs and the class cannot avoid this conduct as they cannot force Defendant to change its conduct and they cannot switch mortgage servicers.  As a result of their circumstance and Defendant's actions, Plaintiffs and the class are at risk of losing their homes and incurring substantial costs all because Defendant has purchased the right to service their mortgage loans without any intent or capability to properly do so.

134.    An injunction also is appropriate because Plaintiffs and the class do not have an adequate remedy at law.  The only way to escape their situation is to sell their homes.  They cannot walk away from Defendant and are at Defendant's mercy.  Since laws cannot prevent Defendant from continuing its illegal and harmful course of conduct, an injunction should issue to protect Plaintiff and the class.  While monetary awards can compensate Plaintiffs and the class for past harm, they cannot prevent Defendant from continuing its illegal course of conduct and causing future harm.

135.    Granting an injunction is in the public interest because myriad mortgage loans throughout the country are serviced by Defendant.  If Defendant is not enjoined it could damage hundreds and thousands of individuals throughout the country.  Enjoining Defendant's conduct will allow persons who are capable of paying their mortgages to come current on their loans and

keep their homes and will prevent illegal and unnecessary fees and emotional stress from further harming Plaintiffs and the class.

136.    Finally, the balance of hardships favors Plaintiffs and the class.  Again, Plaintiffs can do nothing to avoid Defendant's conduct and are at Defendant's mercy.  Defendant is capable of hiring more individuals, properly training them, and paying and instructing them so that they fairly interact with homeowners, and do not unfairly attempt to push them out of their homes for Defendant's financial gain.  While an injunction would cause Defendant to incur more costs, those costs are not outweighed by the benefits to Plaintiffs and the class.  Moreover, Defendant knew those costs were required to properly service mortgage loans, but decided not to incur them in hopes of making its business more profitable by pushing persons out of their homes.  Defendant should not be permitted to forgo the costs required to properly and fairly service mortgage loans.

137.    For all of these reasons, an injunction is necessary and proper here and should be issued against Defendant's current mortgage servicing policies and practices and require Defendant to adopt policies and practices reasonably calculated to comply with the common law, state and federal consumer protection laws, and state and federal mortgage servicing laws.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the other members of the proposed classes, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A.    Declaring that this action is a proper class action, certifying the classes as requested herein, designating Plaintiffs as class representatives and appointing the undersigned counsel as class counsel;

B.    Ordering Defendant to pay damages as provided for by statute or common law;

C.    Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the members of the classes as a

result of Defendant's unlawful, unfair, fraudulent, deceptive and misleading business acts and practices;

D.      Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful policies, practices and procedures as set forth herein;

E.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the classes;

F.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

G.      Ordering such other and further relief as may be just, proper, necessary and appropriate.

Dated: July 10, 2017                    Respectfully submitted,

                                        */s/ Edwin J. Kilpela*
                                        Edwin J. Kilpela
                                        ekilpela@carlsonlynch.com
                                        Benjamin J. Sweet
                                        bsweet@carlsonlynch.com
                                        Kevin Abramowicz
                                        kabramowicz@carlsonlynch.com
                                        **CARLSON LYNCH SWEET KILPELA &
                                        CARPENTER, LLP**
                                        1133 Penn Avenue, 5th Floor
                                        Pittsburgh, PA 15222
                                        Telephone: (412) 322-9243
                                        Fax: (412) 231-0246

                                        Michael K. Yarnoff
                                        myarnoff@kehoelawfirm.com
                                        **THE KEHOE LAW FIRM, P.C.**
                                        Two Penn Center Plaza
                                        1500 JFK Boulevard, Suite 1020
                                        Philadelphia, Pennsylvania 19102
                                        Telephone: (215) 792-6676

                                        *Attorneys for Plaintiffs*

26